248 So.2d 287

**STATE of Louisiana**

v.

**Robert G. HAIK.**

No. 51126.

May 4, 1971.

Rehearing Denied June 7, 1971.

Garon & Brener, Milton E. Brener, New Orleans, for defendant-relator.

Jack P. F. Gremillion, Atty. Gen., Harry H. Howard, Asst. Atty. Gen., Robert J. Zibilich, Dist. Atty. ad hoc, for plaintiff-respondent.

HAMLIN, Justice:

Exercising our supervisory jurisdiction, Art. VII, Sec. 10, La.Const. of 1921, we directed Certiorari to The Honorable Judges, Appellate Division No. 2 of the Criminal District Court, Parish of Orleans, State of Louisiana, for review of its judgment, January 14, 1971, which affirmed defendant's conviction by the trial court of the offense of Unauthorized Use

of Movables, LSA–R.S. 14:68,[1] and his sentence to serve six months in the Parish Prison and to pay a fine of $100.00 or to serve thirty days in default of payment of said fine.

Defendant reserved a bill of exceptions to the judgment of The Honorable Judges of Appellate Division No. 2.[2] The bill was signed January 21, 1971; made part thereof were the pleadings, the evidence, the previous bills of exceptions, the rulings of the trial court, the judgment of Appellate Division No. 2, and the order denying rehearing. No per curiam was written to the bill, and no per curiams were written by the trial court.

A bill of information filed against the defendant by the Assistant District Attorney for the Parish of Orleans on February 9, 1970, recites, in part:

"ROBERT G. HAIK, late of the Parish of Orleans, between the eleventh day of June in the year of our Lord, one thousand nine hundred and sixty-nine and continuing through the 17th day of July, 1970, with force and arms in the Parish of Orleans aforesaid, and within the jurisdiction of the Criminal District Court for the Parish of Orleans, did unlawfully and intentionally take and use United States Currency in the amount of Fifty Thousand ($50,000.00) Dollars, belonging to one JANE GARDINER, without her consent, but without the intention to deprive the said JANE GARDINER permanently of said United States Currency, contrary to the form of the Statute of the State of Louisiana in such case made and provided and against the peace and dignity of the same."

A motion to quash the bill of information on the ground that the Criminal District Court is without jurisdiction was filed by defendant. This motion to quash will be discussed infra.

The facts leading to the filing of the Bill of Information, supra, are to the effect that at a meeting held in her home in Laurel, Mississippi, during January of 1966, Mrs. Jane Gardiner introduced the defendant to George Grim and Leonard Wickenhauser. All parties were interested

---

1. "Unauthorized use of movables is the intentional taking or use of any movable which belongs to another, either without the other's consent, or by means of fraudulent conduct, practices or representations, but without any intention to deprive the other of the movable permanently. The fact that the movable so taken or used may be classified as an immovable, according to the law pertaining to civil matters, is immaterial.

"Whoever commits the crime of unauthorized use of movables shall be fined not more than one hundred dollars, or imprisoned for not more than six months, or both." LSA–R.S. 14:68.

2. Appellate Division No. 2 was composed of The Honorables Bernard J. Bagert, Oliver P. Schulingkamp, Frank J. Shea, Israel M. Augustine, Jr. and Alvin V. Oser.

in oil; on trial of the Motion to Quash, Mrs. Gardiner testified as follows:

"A. Yes. I made arrangements that he would come up and see Mr. Grim there and to work on some things in Louisiana.

"Q. He went to Mississippi, and what was agreed upon between Mr. Grim and Mr. Haik?

"A. A lot. The important thing was to work out properties together. I have been a broker for thirty-two years. Every case I had it's the same way. We were to work out some cases in Louisiana because Mr. Grim and Mr. Wickenhauser, most of theirs was in Mississippi. So I introduced him to Mr. Grim. I said, 'This is my lawyer, my oil man, and he will work with us, represent me in properties there.' And then we said, agreed that if all the properties of anything that Wickenhauser and Grim and Haik made, half of Haik's profits would be to me. We shook hands on it and we said it again. That was our agreement."

Mrs. Gardiner stated that she did not put up any money because, "It wasn't necessary. I asked to. I was capable of putting up, but I was a broker and was not used to putting up money. My duty was to get Mr. Haik and Mr. Grim and Mr. Wickenhauser together. * * *"

Haik, Grim, and Wickenhauser were thereafter joined by Ray Hubbard of Dallas, Texas, who assisted in financing; the four of them purchased royalties, overriding royalties, and a working interest in Louisiana properties—not located in Orleans Parish—owned by the Shell Oil Company located in Louisiana. The act of sale, executed in May, 1967 with the purchase date as of January 1, 1967, was passed before a Shell Oil Company attorney in the New Orleans Shell offices.

On November 17, 1967, defendant addressed to Mrs. Gardiner the following letter:

"By instrument dated May 23, 1967, and effective as of January 1, 1967, and recorded as follows:

| PARISH | BOOK | ENTRY NO. |
| --- | --- | --- |
| Jefferson Davis | 309 | 317069 |
| Terrebonne | 437 | 320033 |
| Claiborne | 339 | 244060 |
| Assumption | 165–A | 82103 |
| Beauregard | 236 | 187708 |

I acquired from Shell Oil Company an undivided 1/4 interest in and to certain overriding royalty and royalty interests, all as more fully described in said conveyance, a copy of which is annexed hereto.

"On the same date, R. E. Hubbard, Jr. acquired from Shell Oil Company a working interest in certain oil and gas leases subject to a Production Payment which was simultaneously conveyed to Main Street Charities, Inc. which in turn mortgaged it to the First National Bank in Dallas. After the acquisition R. E. Hubbard, Jr. mortgaged his working interest to the First National Bank in Dallas.

"This letter is intended to confirm my agreement *to assign to you an undivided ½ interest in the royalty and overriding royalties which I acquired* from Shell Oil Company by virtue of the instrument described in the first paragraph of this letter. The assignment of the ½ interest to you will be effective on the first day of the month following the month in which the Production Payment, now owned by Main Street Charities, Inc., shall be paid out. Based on our projection of present income this will be about thirty six months from the date hereof.

"It is understood and agreed that your right to receive a share of the royalty and overriding royalty interests acquired by me from Shell Oil Company and described in the first paragraph of this letter shall commence after the payout of the Production Payment and you shall have no right to receive any of *said royalty and overriding royalties* until that time. If for any reason the Production Payment does not pay out, then the rights conveyed hereunder shall not come into existence.

"I bind and obligate myself to execute and deliver to you a recordable instrument conveying the ½ interest which I have agreed to convey to you whenever the Production Payment described above shall pay out.

"If the above and foregoing sets out our agreement, kindly indicate your approval by signing and returning the duplicate copy of this letter.

"Very truly yours,

"[Sgd] Robert G. Haik"

(Emphasis ours.)

On November 24, 1967, Mrs. Gardiner signed and returned the duplicate copy of the above letter. At the foot of the letter appears the following:

"APPROVED AND AGREED TO THIS 24 DAY OF Nov., 1967
[Sgd] Jane Garrison Gardiner"

During the latter part of 1968, the owners decided to sell their working interest in the Shell properties; the sale was consummated in Dallas, Texas, on June 11, 1969. On trial of the Motion to Quash, Wickenhauser testified:

"Q. Where did the act of sale take place and the money received?

"A. The act of sale had taken place in Dallas and money received in Dallas.

"Q. What was the amount of money?

"A. One million, nine hundred thousand dollars was the gross figure of the sale less various obligations, allowing net to each of the four major interest owners of $102,000.00 apiece. Of that $102,000.00—that was net proceeds from the sale.

" *  *  *

"Q. Was Mr. Haik in Dallas on June 11th?

"A. Yes, he was there June 11, 1969.

"Q. Did you see him in Dallas?

"A. Yes.

"Q. Was there any place but Dallas that you did see him on that date?

"A. Not that I can recall, no.

"Q. Was it the First National Bank in Dallas?

"A. Yes."

3. The Motion to Quash recites:
" *  *  * ROBERT HAIK, defendant, and moves that the indictment herein, be quashed under the provisions of Article 532(8) of the Code of Criminal Procedure for the reason that this Court has no jurisdiction of the offense charged. In support thereof, avers as follows:
"I.
"All of the acts complained of by the State herein, occurred in Dallas, Texas; that none of the acts complained of in the Bill of Information occurred either

The record shows that on June 11, 1969, Robert G. Haik deposited to the credit of his account with the First National Bank in Dallas, Dallas, Texas, the sum of $102,979.-89. There is no evidence as to whether the amount was withdrawn by him. Mrs. Gardiner received no money from Haik, and, as stated supra, the present bill of information was filed on February 9, 1970.

As stated supra, a Motion to Quash was filed and overruled in the trial court.[3] The case was thereafter heard on its merits by the trial court, and the verdict and sentence, supra, were rendered and imposed.

Five bills of exceptions were reserved during the proceedings in the lower court. The trial judge signed bills nos. 1 through 4 but did not sign bill no. 5. Bill of Exceptions No. 5 was reserved to the court's overruling of a Motion for a New Trial, which motion was mainly based upon the grounds set forth in the bills of exceptions reserved during the trial (C.Cr.P. 841); an additional averment was to the effect that there was a complete lack of evidence to support the finding of guilty.

in the Parish of Orleans, nor even in the State of Louisiana, and that therefore this Court is without jurisdiction to try the defendant for the offense charged.
"II.
"Under the provisions of Article 615 of the Code of Criminal Procedure, the State should be compelled to prove in limine, the jurisdiction of this Court over the alleged offense and that failing such proof, the Bill of Information should be quashed and the defendant discharged.
" *  *  * *"

The trial judge, as stated supra, wrote no per curiams. We do not know why he did not sign Bill of Exceptions No. 5, but the bill has been considered by the State and counsel for the defendant as having been signed.

Appellate Division No. 2 did not assign written reasons for its judgment. It merely stated, "THE JUDGMENT APPEALED FROM IS AFFIRMED."

In this Court, defendant assigns specification of two errors to the judgments of the trial court and Appellate Division No. 2; they recite that the latter erred as follows:

"1. Finding that Mrs. Gardiner was entitled to claim ownership, or any of the benefits resulting from ownership in Louisiana mineral rights based solely on parol evidence, and despite the clear indication in the only pertinent written document, Defense Exhibit 2, that the agreement between Gardiner and Haik provided only for the conveyance by Haik to Gardiner of a one-half interest in the royalties and overriding royalties with respect to the land purchased.

"2. In failing to sustain defendant's motion to quash based on lack of jurisdiction of the Criminal District Court despite a lack of any evidence that any element of any offense, or of any of the acts complained of, were committed in the Parish of Orleans or the State of Louisiana, and in the face of affirmative evidence to the effect that all of the acts complained of occurred outside of the State of Louisiana."

We find Specification of Error No. 2 (Bills of Exceptions Nos. 2 and 3 reserved in the trial court) to be with merit; it is therefore unnecessary for us to discuss Specification of Error No. 1.

Article 611 of the Code of Criminal Procedure recites:

"All trials shall take place in the parish where the offense has been committed, unless the venue is changed. If acts constituting an offense or if the elements of an offense occurred in more than one place, in or out of the parish or state, the offense is deemed to have been committed in any parish in this state in which any such act or element occurred."

A Motion to Quash may be based on the ground that the trial court has no jurisdiction of the offense charged. Art. 532(8), LSA–C.Cr.P. "Improper venue may be raised by motion to quash, and in such case the motion shall be tried by the judge alone. Even if the issue of venue has been passed upon by the judge prior to trial, the state on the trial shall have the burden of proving proper venue beyond a reasonable doubt." Art. 615, LSA–C.Cr.P.

Herein, the State argues:

"In the state's view an element of the offense is the possession or use of the money belonging to Mrs. Gardiner by the defendant. It avails the defendant naught to admit that he took the money but deposited it in Dallas, Texas. This is because he has constructive possession of this money. A person who comes into possession of my watch and places it in a safety deposit box cannot escape the consequences of the law by saying he does not possess my watch because it it not on his arm. He will be convicted because he does possess my watch, albeit constructively."

Defendant argues:

"There was no testimony that Mrs. Gardiner ever saw Haik in New Orleans—merely that she understands he lives here. There is also testimony that Haik, on one or two occasions, met with several of the parties in the Roosevelt Hotel in New Orleans, but this was long before the earliest date alleged in the Bill of Information, namely, June 11, 1969. * * * These meetings in New Orleans could have no bearing at all on jurisdiction, for they occurred long before the existence of the funds that Haik supposedly wrongfully appropriated.

"* * *

"First of all, there is no evidence that any use was ever made of those funds after their deposit or that if any use was made that they were used in New Orleans, or anywhere in the State of Louisiana, or anywhere else, for that matter. * * *"

■ We have read the testimony adduced at the hearing of the Motion to Quash. Only Mrs. Gardiner and Wickenhauser testified; neither testified that Haik had money on deposit in the First National Bank in Dallas, Dallas, Texas, after June 11, 1969 and up until July 17, 1970; neither offered any proof as to what disposition was made of Haik's deposit of the sum of $102,979.89 in said bank on June 11, 1969; neither offered proof that any of the currency received at the sale of the working interest, supra, arrived in and was used or spent in Louisiana. There was no evidence of constructive possession in Haik in Louisiana of currency or movables obtained as a result of the Texas sale. The evidence did not show that any element of the offense charged was committed in New Orleans or in Louisiana. Under the facts and circumstances of this matter, we conclude that the Criminal District Court for the Parish of Orleans was without jurisdiction to try the offense charged against the defendant.

As a matter of precaution, we have read the testimony adduced at defendant's trial; it reflects that no element of the offense charged was committed in Louisiana.

For the reasons assigned, the Motion to Quash the instant Bill of Information on the ground that the Criminal District Court for the Parish of Orleans was without jurisdiction to try the offense charged against the defendant is sustained; the judgment of Appellate Division No. 2 of the Criminal District Court for the Parish of Orleans is reversed and set aside; the conviction and sentence of defendant are likewise reversed and set aside, and defendant is discharged without date.

DIXON, Justice (concurring).

I fully concur in the opinion of the majority. However, the shocking injustice of this prosecution requires further note.

The complaining witness is the mother of the district attorney for Orleans Parish.

It cannot be supposed that the district attorney was surprised by his evidence. If all things testified to by the witnesses had occurred in Orleans Parish, there would still have been no crime committed by the defendant. Mrs. Garrison owned no movable or immovable involved in this transaction. The most that she could be said to own was a right of action (on the value of which we express no opinion); she lost nothing she ever owned; she still has every right she ever had.

This was a criminal prosecution for debt, not contemplated by R.S. 14:68 nor any other law of this State. The statute requires the misuse of a thing *"which belongs to another."* There was never any currency, as charged in the bill of information, involved in the transaction. A check—a credit—not owned by Mrs. Garrison was deposited by the defendant. The deposit became a credit—again not owned by Mrs. Garrison.

Judge Alvin V. Oser, one of the criminal district judges who sat on the Appellate Division in this case, filed an instrument recusing himself because he was an assistant district attorney prior to June 18, 1969, when he became a judge. The next day he filed a "Motion to Rescind Recusation" and reinstated himself, because this "is not a case that I had personal knowledge of."

Article 671 of the Code of Criminal Procedure, paragraph (3) would not require personal knowledge of the case if the judge had "been associated with an attorney during the latter's employment in the cause." If this case had been in the district attorney's office prior to June 18, 1969 (not an unreasonable assumption) the judge was right the first time, and should have allowed his recusation to stand.

After the trial and after the conviction had been affirmed by the Appellate Division, but *before* the judgment became final,

the defendant suffered the ultimate indignity: he was arrested and jailed on a warrant issued by Judge Malcolm V. O'Hara, the trial judge. On application to this court by the defendant on January 15, 1971, he was ordered released from the custody of the sheriff.

Defendant is an attorney at law, whose reputation, according to testimony adduced at the trial, was excellent. Now his name will appear in a reported decision; he goes free, but on what the wary and suspicious may call a "technicality."

It is easy to see why the duty of a district attorney differs from that of an ordinary lawyer. A lawyer is free to be a partisan on behalf of his client, and partisanship is a part of advocacy. But the district attorney's duty is to seek justice, not merely to convict. The prosecutor represents the State, and should use restraint in the discretionary exercise of governmental powers. He should not institute criminal charges when the charges are not supported by probable cause. (ABA Code of Professional Responsibility, Canon 7, EC 7–13; Disciplinary Rule 7–103(A)).

When the district attorney prosecutes a creditor of his mother for acts requiring novel and strained interpretations to bring them within criminal statutes, the prosecution is reprehensible.